UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                        Plaintiff,          03 Civ. 2742 (JGK)

              - against -                   <u>OPINION AND ORDER</u>

DAVID A. ZWICK and
TERRENCE J. O'DONNELL,

                        Defendants.
————————————————————————————————

JOHN G. KOELTL, District Judge:

     In this action, the Securities and Exchange Commission (the

"SEC") sued David Zwick and Terrence J. O'Donnell for violations

of the federal securities laws in connection with a scheme to

defraud New York Life Insurance Company ("New York Life").  At

all times relevant to this case, both Zwick and O'Donnell were

securities professionals associated with the Ft. Lauderdale

broker-dealer Suncoast Capital Group ("Suncoast").  From January

1998 through May 1999, Anthony Dong-Yin Shen, a bond trader at

New York Life, defrauded his employer by directing bond trades

to Suncoast, frequently at prices materially unfavorable to New

York Life, in return for cash and other gifts.  Deborah

Breckenridge, a sales representative at Suncoast, provided items

of value to Shen and received sales commissions from Suncoast's

trades with New York Life in return.  Shen and Breckenridge were

criminally convicted of securities fraud for their roles in the

scheme.

At the time of the relevant events, Zwick was a one-third owner of the general partner of Suncoast, a principal of the firm, Breckenridge's supervisor, and the Chief Compliance Officer for the firm.  O'Donnell, a Suncoast mortgage-backed bond trader, executed the Suncoast–New York Life trades starting in 1997 until in or around May 1999.

The complaint alleged three claims against the defendants: (1) direct violations of Section 17(a) ("Section 17(a)") of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a) (First Claim);[1] (2) direct violations of Section 10(b) ("Section 10(b)") of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder ("Rule 10b-5"), 17 C.F.R. § 240.10b-5 (Second Claim);[2] and (3) aiding

---

[1] Section 17(a) provides:

It shall be unlawful for any person in the offer or sale of any securities... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

[2] Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of

and abetting Breckenridge's and Shen's violations of Section 10(b) and Rule 10b-5, in violation of Section 20(e) ("Section 20(e)") of the Exchange Act, 15 U.S.C. § 78t(e) (Third Claim).[3] After a three week trial, the jury returned a special verdict in which it was asked not only whether each defendant violated the specific provisions of the federal securities laws as charged in the complaint, but also, if they found a violation, to identify

---

any national securities exchange... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

[3] Section 20(e) provides:

For purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

which of two schemes constituted the violation.  The first scheme was a scheme to provide bribes, kickbacks, and items of value to Anthony Shen in exchange for Shen's directing trades from New York Life to Suncoast.  The second scheme involved the failure to disclose to New York Life excessive markups charged by Suncoast on its trades with New York Life.  The jury's responses to the special verdict form found that Zwick had violated each of the three provisions of the securities laws at issue by participating in and aiding and abetting both schemes. The jury found that O'Donnell did not directly violate either Section 17(a) or Section 10(b) and Rule 10b-5, and violated Section 20(e) only by aiding and abetting Breckenridge and Shen in the excessive-markup scheme.

     At the close of the trial, after the jury returned its verdict, the defendants orally moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59.  The Court reserved decision on those motions and the parties proceeded to brief them.  Meanwhile, the SEC has requested the relief that it contends should be included in the judgment to be entered by the Court.  The SEC seeks a permanent injunction against each defendant prohibiting him from violating Section 17(a) and Section 10(b) and Rule 10b-5; an order of disgorgement in the amount of $181,625.18 for Zwick and

$53,567.44 for O'Donnell, together with pre-judgment interest; and civil penalties in the amount of $330,000 for Zwick and $110,000 for O'Donnell.  The defendants have resisted each of the claims for relief, contending that no injunction should be issued and that the amounts of disgorgement and civil penalties, if any, should be substantially less than those sought by the SEC.

For the reasons explained below, the defendants' motions pursuant to Rules 50(b) and 59 are **denied**.  The Court will enter a judgment that includes some—but not all—of the relief sought by the SEC.

### I.

It is well-established that a district court should deny a Rule 50 motion unless "viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154-55 (2d Cir. 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)) (alteration in original); see also Fowler v. N.Y. Transit Auth., No. 96 Civ. 6796 (JGK), 2001 WL 83228, at *1 (S.D.N.Y. Jan. 31, 2001); Dailey v. Société

Générale, 915 F. Supp. 1315, 1321 (S.D.N.Y. 1996), aff'd in relevant part, 108 F.3d 451, 457-58 (2d Cir. 1997).

A trial court considering a motion under Rule 50(b) "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." Samuels v. Air Transp. Local 504, 992 F.2d 12, 16 (2d Cir. 1993). A jury verdict should be set aside only when "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [the movant]." Logan v. Bennington Coll. Corp., 72 F.3d 1017, 1022 (2d Cir. 1996) (alteration in original) (internal quotation marks and citations omitted); see also Dailey, 915 F. Supp. at 1321.

In the alternative, the defendants move for a new trial pursuant to Rule 59. See Fed. R. Civ. P. 59(a).[4] In determining whether a new trial is appropriate under Rule 59(a), a court makes the same type of inquiry as on a motion for judgment as a

---

[4] Federal Rule of Civil Procedure 59(a) provides:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States....

matter of law, but it imposes a less stringent standard.  <u>See</u>
<u>Katara v. D.E. Jones Commodities, Inc.</u>, 835 F.2d 966, 970 (2d
Cir. 1987).  A Rule 59(a) motion "ordinarily should not be
granted unless the trial court is convinced that the jury has
reached a seriously erroneous result or that the verdict is a
miscarriage of justice."  <u>Patrolmen's Benevolent Ass'n v. City</u>
<u>of New York</u>, 310 F.3d 43, 54 (2d Cir. 2002) (internal quotation
marks omitted); <u>Katara</u>, 835 F.2d at 970; <u>Newmont Mines Ltd. v.</u>
<u>Hanover Ins. Co.</u>, 784 F.2d 127, 132 (2d Cir. 1986); <u>Fowler</u>, 2001
WL 83228, at *2.

## II.

There was sufficient evidence introduced at trial from
which the jury could reasonably have found as follows.

Zwick co-founded Suncoast in 1993.  (Trial Tr. ("Tr.")
1457.)  In or around August 1993, Zwick hired Breckenridge to be
an administrative assistant at Suncoast.  (Tr. 661-62.)  She was
eventually promoted to a sales position and began to receive 40
percent to 50 percent of Suncoast's gross commissions on her
sales to institutional customers.  (Tr. 670, 1038.)

In late 1997, Breckenridge began to arrange securities
trades with New York Life through Shen, a trader at New York
Life.  (Tr. 687-88.)  The securities trades with New York Life
were "riskless."  As the SEC's expert Perrin Arturi explained, a

- 7 -

"riskless" transaction is one in which the trader incurs little or no risk because the trader purchases and sells the security simultaneously, essentially acting as an agent of the buyer or seller.  (Tr. 1152-56.)  Suncoast would purchase the security from New York Life and simultaneously sell it to another customer, usually a primary broker-dealer, or buy the security from another customer and simultaneously sell it to New York Life.  (Tr. 552, 694, 1162-63, 1914-15, 1921.)  All the trades with New York Life beginning in 1997 were "riskless" trades. (Tr. 564, 694, 1152, 1155-56.)

The securities transactions that Breckenridge arranged with New York Life were primarily the purchase from or the sale to New York Life of mortgage-backed securities issued by federal agencies.  The mortgages underlying those securities were either "to be announced" ("TBA") or "specified pools."  (Tr. 1162-64.) The transactions also involved some Treasury bonds.  (Tr. 1165.) According to Arturi, the prevailing rate charged by a broker to effect the purchase or sale of a TBA on a riskless principal or agency basis was the difference between the buy and sell price of the security, which in 1998 and 1999 was 1/32 of one percent of the value of the TBA bond or Treasury bond and 4/32 of one percent of the value of a specified pool.  (Tr. 1164-65.)

A "tick" is the commonly used term for 1/32 of one percent of the value of the bond, or $312.50 per million dollars on a

bond.  (Tr. 1145-46.)  Arturi testified that the purchases or sales of TBAs or Treasury securities to New York Life that included a markup of 2 ticks or more included an unreasonable or excessive markup, and that the purchases or sales of specified pools to New York that included a markup in excess of 8 ticks included an unreasonable or excessive markup.[5]  (Tr. 1164-66.) Arturi concluded that, during 1998 and 1999, Breckenridge arranged twenty-seven transactions with New York Life that included excessive markups.  (Tr. 1165.)  These twenty-seven transactions, out of a total of forty-nine transactions with New York Life (Tr. 1165), included excessive markups and the total commissions earned on those transactions was about $1.3 million out of total commissions on all transactions with New York Life in excess of $1.6 million (Pl.'s Ex. 154-A, 154-B).

In late 1997, when Breckenridge began arranging securities trades with Shen, Breckenridge's riskless trades with New York Life carried markups that ranged from approximately 0.13 ticks to 1.75 ticks and earned Suncoast gross commissions of between approximately $1,400 and $11,000 per trade.  (Pl.'s Ex. 152, 154-B.)  She worked on three more trades with New York Life and

---

[5] The parties have used the term "markup" to refer both to the amount that Suncoast added to the price of the security that it purchased from another customer and then sold to New York Life and to the difference between the discounted price Suncoast paid to New York Life on a security that it purchased from New York Life and then sold to another customer.  Given the convention adopted by the parties, the Court will also use the term "markup" to refer to both situations.

Shen in early January 1998, on which the markups Suncoast charged New York Life ranged from 0.5 ticks to 1.5 ticks. Defendant O'Donnell was the trader for each of these trades.[6]

In 1998 and 1999, all of Suncoast's trades with New York Life were riskless, and all involved either mortgage-backed securities or Treasury bonds. However, the markups Suncoast charged, the gross commissions it obtained, and the manner of trading itself changed significantly in late January 1998, when, shortly after Breckenridge took Shen to dinner in New York, Shen purchased a $25 million Fannie Mae 6.5% TBA bond through Suncoast, giving Suncoast a 3.25 tick markup and a gross commission of $25,390.63 on the trade. The markup was nearly twice the largest markup on any previous riskless New York Life trade, and the gross commission-which was more than twice the largest commission Suncoast had received on any previous trade with New York life-exceeded the gross commissions on all of the 1997 riskless New York Life trades. No one questioned the trade; Zwick and O'Donnell (the trader on the trade) instead congratulated Breckenridge for a "good trade." (Pl.'s Ex. 1-B, 154-B; Tr. 702-10.)

---

[6] Notably, the markups Suncoast charged New York Life on a specified pool transaction on January 16, 1998 was only 1.25 ticks, contrasting sharply with its markups to New York Life on subsequent specified pool transactions in 1998 (27 ticks charged on June 10, 1998 and 12 ticks charged on September 24, 1998), and in 1999 (42.5 and 43 ticks charged on January 13 and 25, 1999 respectively, and 9.5 ticks charged on April 14, 1999). (See Pl.'s Ex. 154-B.)

When Breckenridge asked Shen for a trade the following day, Shen refused, e-mailing Breckenridge "hahaha, sure for two [NBA] allstar tix." (Pl.'s Ex. 2-C; Tr. 268-70.)  Breckenridge discussed the e-mail with Zwick, her supervisor.  Zwick told her that even though it would be a violation of the National Association of Securities Dealers ("NASD") gift rules if Breckenridge did not accompany Shen to the game, Zwick would see if he could get the tickets for Shen.  (Tr. 711.)  Zwick initially thought he might be able to obtain the tickets at no cost from a broker's broker.  (Id.)  Fifteen minutes after Shen had first asked for the tickets, Breckenridge e-mailed Shen that Suncoast was working on getting him the tickets.  Thereafter, Shen announced that "now we can reverse [the previous day's] trade" and gave a firm offer to sell a $25 million Freddie Mae 6.5% TBA to Suncoast at a price below the market price.  (Pl.'s Ex. 2-C; Tr. 271.)  Suncoast then completed the transaction by buying the bond from New York Life and selling it to Lehman Brothers at a markup of 7 ticks for a gross commission of $54,687.50.  (Pl.'s Ex. 154-B.)

Unable to obtain the tickets at no cost, Zwick obtained the All-Star tickets from a Ft. Lauderdale ticket broker for $6,400, arranged for the delivery of the tickets to Shen, and personally rerouted the tickets from Shen's home to his office address at Shen's request.  (Pl.'s Ex. 3-C, 43; Tr. 713-715, 1562-65.)  On

the day the All-Star tickets were delivered, Shen gave Suncoast a third off-market TBA trade, giving Suncoast a 5.5 tick markup and a gross commission of $60,156.25 on a bond Suncoast bought from Salomon Smith Barney and sold to New York Life. (Pl.'s Ex. 3-A, 3-B, 3-C.)

Thus, on three off-market trades within two weeks, Suncoast made more than $140,000 in gross commissions compared to under $50,000 in gross commissions for all its previous trades with New York Life. O'Donnell was the trader on all of these trades. (Pl.'s Ex. 1-A, 1-B, 2-A, 2-B, 3-A, 3-B.)

Zwick did not fill out a gift form for the tickets, nor were the tickets reported to New York Life. Aware that giving tickets to unattended sporting events for trades was considered bribery, Zwick nonetheless personally obtained the tickets, ensured that Shen was satisfied with the seats, and ensured that Shen received them. (Tr. 1627.) Breckenridge's compensation was reduced by 40 percent of the cost of the tickets, just as she would receive 40 percent of any commissions she generated. (Tr. 1629-30.) Shen understood that the All-Star tickets were a sign that Suncoast was prepared to swap trades for incentives. (Tr. 208.)

Thereafter, Breckenridge engaged in a series of "one-way" bets with Shen, on the outcome of events such as the Academy Awards or sporting events such as the Masters Golf Tournament.

As Shen explained to Breckenridge over the telephone, betting
with him was a "win-win" proposition.  If Breckenridge lost, she
would pay off the bet, and Shen would provide a favorable trade
to Suncoast.  If Shen lost, he would provide a favorable trade
to Suncoast.  (Tr. 720-724, 739-41.)  Shen continued to provide
trades to New York Life with excessive markups.  Breckenridge
testified credibly that Zwick was aware of the continuing
arrangement, and indeed instructed her on how to make the
payments.  (Id.; Tr. 728-32, 738.)  Zwick also instructed
Breckenridge to keep her trades with New York Life quiet after a
co-worker complained about the trades with Shen, but also
instructed her to continue trading with Shen, and to keep Shen
happy.  (Tr. 752-54.)

     When Shen asked for tickets to a Knicks game on May 10,
1998, Breckenridge discussed Shen's request with Zwick.  Zwick
told her that the firm had already spent too much on Shen, but
he advised her that she could use the same ticket broker who
sold him the NBA All-Star tickets he obtained for Shen in
February, and gave Breckenridge the business card for the
broker.  He also said, if anyone asked about the conversation,
he would deny that it had occurred.  Breckenridge followed
Zwick's advice, purchasing the tickets for $2,600 on May 6,
1998.  In return, Shen sent New York Life trades to Suncoast in
May to "compensate [Suncoast] for the price they had to pay for

the tickets."  Breckenridge told Zwick that she had purchased the tickets, and he told her to keep up the good work.  (Pl.'s Ex. 110; Tr. 359-60, 759-66.)

In 1999, in response to Shen's request for some travel and entertainment from Suncoast, Zwick agreed to pay for Shen's expenses for a trip in April to Paradise Island, a gambling casino in the Bahamas, where he would be accompanied by Breckenridge and her husband.  After the trip, Zwick asked Breckenridge about the trip and whether she had paid for Shen's gambling.  Breckenridge said that she had paid her debts, that she paid off her bets.  Breckenrdige paid Shen $14,000 in cashier's checks and $6,000 in cash to compensate him for the New York Life trades with Suncoast.  (Pl.'s Ex. 111; Tr. 788-93.)[7]

Breckenridge testified that defendant O'Donnell executed the mortgage-backed securities trades with New York Life in 1998 and 1999, as well as the riskless TBA trades with New York Life in 1997.  (Tr. 754.)  O'Donnell executed twenty of the twenty-seven trades with excessive markups.  The remaining seven trades

---

[7] In January 1999, Breckenridge agreed with Shen to give him 6.258% of her commissions on the New York Life trades, rather than compensation through the practice of one-way bets.  Breckenridge did not tell anyone at Suncoast about the change because she was concerned that without the guise of betting she would lose her job or at least be told not to trade with Shen.  (Tr. 786-88.)

involved Treasury securities.[8]  O'Donnell received a commission

on the New York Life trades he executed for Breckenridge.  (Tr.

1900-04.)  The jury could reasonably find that he was aware that

the trades he executed with New York Life contained excessive

markups.  His position as a trader provided him with the

information to see that the markups to New York Life were in

fact excessive, and O'Donnell testified that he reviewed the

prices in the market for the New York Life trades he executed

and reviewed the markups to determine if they were excessive.

(Tr. 1911-12.)  Despite this review, he executed a trade on

January 13, 1999 on a specified pool which Suncoast sold to New

York Life at a markup of 42.5 ticks, substantially in excess of

1 percent or 32 ticks, for a gross commission of $125,590.11.

(Pl.'s Ex. 154-B; Tr. 1905-06.)  He also executed a sale of

another specified pool to New York Life on January 25, 1999 with

a markup of 43 ticks, again substantially in excess of 1 percent

or 32 ticks, for a gross commission of $148,157.56.  (See Pl.'s

Ex. 154-B.)

    Moreover, there was evidence from which the jury could

reasonably have inferred that O'Donnell took steps to disguise

the excessive markups to New York Life.  For example, he tried

---

[8] O'Donnell contends that he was out of the country and did not
execute several of the trades with excessive markups attributed to
him.  (Tr. 1863-64.)  There is no dispute, however, that O'Donnell
executed the great majority of the mortgage-backed securities trades
with excessive markups.

to locate higher coupon (9% to 10%) mortgage pools to trade with New York Life as a means to conceal the red flag raised by the progressively higher spreads on the New York Life trades.  (Tr. 1032-34.)  When Breckenridge informed O'Donnell that someone at New York Life had questioned the $150 million dollar roll trade he did on April 7, 1999 as excessively marked up, he did not challenge or investigate that statement, but proceeded to alter the trade tickets to make it appear that, consistent with Shen's excuse for the trade, all the individuals involved in the trade—including Breckenridge, O'Donnell, and Shen—had coincidentally all made the same mistake on the price.  (Tr. 794-96, 801-03.) This resulted in reducing the original 2 1/4 tick markup to a 1/4 tick markup and reduced the commission from $90,000 to $11,000.  (Id.)  Finally, O'Donnell also executed the last trade between Suncoast and New York Life on May 13, 1999, a trade conducted at no profit to Suncoast, designed to make it appear that there had been some "legitimate" business between Suncoast and New York Life.  (Pl.'s Ex. 185; Tr. 806-07.)

### III.

#### A.

Both Zwick and O'Donnell argue that they are entitled to judgment as a matter of law or a new trial on the grounds that, as a matter of law, the jury could not have found, or at least

was seriously erroneous in concluding, that there was a scheme

to defraud based on charging New York Life excessive markups.

Each of the defendants argues that the markups in this case were

not excessive under the current law, that the defendants were

not on notice that the markups in this case could be deemed

excessive, and indeed, that it would be a violation of due

process to uphold a jury verdict that concluded that the markups

were excessive.

　　The Court of Appeals for the Second Circuit has long

recognized that broker-dealers must disclose excessive markups

to their customers.  See Press v. Chem. Inv. Serv. Corp., 166

F.3d 529, 534 (2d Cir. 1999) (stating that a broker "has a duty

to disclose the specifics of a markup... when there is either a

fiduciary relationship with the complaining party or when the

markup is 'excessive.'" (citing Grandon v. Merrill Lynch & Co.,

147 F.3d 184, 190 (2d Cir. 1998)));  Charles Hughes & Co. v.

SEC, 139 F.2d 434, 437 (2d Cir. 1943) ("[T]he [SEC] has

consistently held that a dealer cannot charge prices not

reasonably related to the prevailing market price without

disclosing that fact."); see also SEC v. Feminella, 947 F. Supp.

722, 728-29 (S.D.N.Y. 1999).  The duty is grounded in the

"implied representation that broker-dealers charge their

customers securities prices that are reasonably related to the

prices charged in an open and competitive market."  Grandon, 147

F.3d at 189; see also SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1469 (2d Cir. 1996).

It is also well-established that a "failure to disclose an excessive markup constitutes a violation of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder." Feminella, 947 F. Supp. at 731 (emphasis omitted); see also Grandon, 147 F.3d at 190 ("a broker-dealer commits fraud... by charging customers excessive markups without proper disclosure"); First Jersey, 101 F.3d at 1469 ("a broker-dealer who charges customers retail prices that include an undisclosed, excessive markup violates § 17(a) and § 10(b) of the securities laws"). Markups are measured as the difference between the price charged to the customer and the prevailing market price. Absent other evidence, the market price is the dealer's cost of acquiring a security or the price the dealer received on the sale of that security. See Grandon, 147 F.3d at 189. Markups are excessive when they bear "no reasonable relation to the prevailing market price." Id. at 190.

The determination of whether a markup is excessive involves a factual analysis to be done on a case-by-case basis; the reasonableness of the markups charged differs depending on the circumstances, including, specifically, the type of securities involved in the trades. See Feminella, 947 F. Supp. at 729 ("there is no single, fixed definition of what constitutes an

excessive markup for all transactions"). Among the factors
relevant to the determination of whether a markup is excessive
are

> the expense associated with effectuating the
> transaction, the reasonable profit fairly earned by
> the broker or dealer, the expertise provided by the
> broker or dealer, the total dollar amount of
> transaction, the availability of the financial product
> in the market, the price or yield of the instrument,
> the resulting yield after the subtraction of the
> markup compared to the yield on other securities of
> comparable quality, maturity, availability, and risk,
> and the role played by the broker or dealer.

Press, 166 F.3d at 535; see Grandon, 147 F.3d at 190 (discussing
relevant considerations in assessing excessiveness of markups on
municipal securities). The finder of fact must assess various
factors including "industry practice regarding the range of
appropriate markups on a particular security or similar type of
security in comparable transactions... and the nature of the
services that the brokerage firm or its associated persons have
provided to the customer." Feminella, 947 F. Supp. at 729
(citations omitted); see In the Matter of Lehman Bros. Inc.,
S.E.C. Exchange Act Release No. 34-37673, 1996 WL 519914, at *5
(Sept. 12, 1996).

Both defendants argue that the alleged excessive markups on
the trades involved in this case, which ranged from 2.5 ticks to
43 ticks, were simply too low as a matter of law to be
excessive. However, based on the particular facts and
circumstances of this case, and viewing those facts in the light

most favorable to the SEC, a rational jury could conclude that Suncoast's charges to New York Life in this case included excessive markups.

During the trial, the SEC presented substantial evidence to show that the prices charged by Suncoast to New York Life included excessive markups.  First, the SEC presented expert testimony from Perrin Arturi, the only expert presented at the trial, who identified twenty-seven trades occurring between January 1998 and April 1999 in which, in his opinion, Suncoast charged excessive markups to New York Life.  (Tr. 1169–70, 1177–78, 1182–85; see also Pl.'s Ex. 154-A.)  Arturi, a senior managing director of Bear Stearns & Company, had extensive experience in the trading of mortgage-backed securities and Treasury securities, including experience trading the types of securities that were traded between Suncoast and New York Life from 1997 to 1999.  (Tr. 1132–37.)  Arturi testified credibly over the course of two days, detailing his substantial background, experience in, and knowledge of the market in which the securities at issue were traded.[9]

Arturi testified concerning standard industry markup practices for the precise securities traded between New York

---

[9] To the extent that the defendants renew their arguments that Arturi was not qualified to provide expert testimony, or that his expert testimony was not reliable, the arguments are rejected for the reasons previously explained both before and during trial.

Life and Suncoast and for the type of trades that occurred.  In addition to his own experience in the market at the time, Arturi relied on information specific to the trades that occurred between Suncoast and New York Life, including a review of e-mails and trade blotters, which detailed the transactions.  (Tr. 1138-39.)  Arturi testified that, on riskless trades, the industry practice at the time of the scheme was to mark up the TBA and Treasury securities 1 tick or 1/32 of one percent of the transaction value.  (Tr. 1164-65.)  In reviewing the Suncoast-New York Life trades, Arturi conservatively identified only those New York Life trades with markups that exceeded twice the industry standard of 1 tick as excessively priced.  (Tr. 1165-1166.)  Similarly, although he opined that the reasonable markup on specified pool transactions was 4 ticks, he only identified trades with markups that exceeded twice the industry standard (that is, more than 8 ticks) as excessively priced in order to be conservative.  (Tr. 1165.)

Arturi considered the differences between the types of securities involved in the Suncoast-New York Life trades in reaching his conclusion regarding the reasonableness of the markups.  Arturi explained that the market for mortgage-backed securities and Treasury securities is very large.  (Tr. 1141.) He distinguished, however, between the two types of mortgage-backed securities that Suncoast and New York Life traded, TBA

and specified pool.  (Tr. 1163-64.)  Arturi explained that
specified pools contain more precise specifications of the
underlying mortgages than TBA mortgage-backed securities.  (Id.)
More importantly, he stated that the specified pools tend to
trade less frequently than TBA securities.  (Tr. 1164.)
According to Arturi, because specified pools trade less
frequently, the markups on specified pools—as an industry
standard—tend to be somewhat higher (id.), which was consistent
with his determination that an excessive markup on a trade
involving a specified pool was more than 8 ticks, whereas an
excessive markup on a trade involving a TBA security was more
than 2 ticks.

    Arturi also considered the amount of risk involved in the
transaction as a factor in determining the industry standard for
the markups Suncoast charged to New York Life.  Arturi concluded
that Suncoast traded with New York Life on a riskless basis, as
an agent.  The defendants argue that Arturi was incorrect in
concluding that Suncoast acted as an agent for New York Life;
the defendants argue that Suncoast in fact acted as a principal
on its trades with New York Life.  However, Arturi made it clear
that there was no substantive difference for the purposes of a
markup between an agent and a "riskless principal."  (Tr. 1152,
1155.)

    In addition, there is ample evidence that Suncoast acted as

an "agent" that did not hold any of these securities for its own account. For example, none of the Suncoast-New York Life trades at issue here were held by Suncoast in its overnight inventory; indeed evidence was adduced showing that Suncoast would have been in violation of its net capital requirements if it had done so on a regular basis. The documentary and testimonial evidence, including the testimony of O'Donnell on cross-examination, showed that Suncoast acquired the securities from the street to sell to New York Life in simultaneous or near simultaneous transactions. (See, e.g., Tr. 694, 1141, 1914-1915, 1921; see also Pl.'s Ex. 1-A to 27-D (trade tickets, blotters, and other supporting documents relating to trades).) Breckenridge explained that all of the New York Life transactions at issue were "riskless principal" transactions, and noted that her commissions sheet showed this because her commission base was calculated as the entire difference between the buy and sell price. (Tr. 667, 694.) Breckenridge's detailed testimony on several of the transactions showed that the trades took place nearly simultaneously. (Tr. 694, 697.) Finally, Arturi testified that the time stamps on the buy and sell tickets and the commission sheets demonstrated that these were simultaneous agency transactions. (Tr. 1141, 1162.)

In contrast, O'Donnell's testimony that these trades were "principal" transactions was undercut when he admitted on cross

examination that he must have been "misquoted" when he testified during his deposition that Suncoast did not act as a principal (Tr. 1915-17), that Suncoast merely acted as an intermediary in its trades (Tr. 1920), that Suncoast usually tried to arrange to buy a security before agreeing to selling to a customer (Tr. 1912), and that when Suncoast lined up both sides of a trade it did so in order to make the transaction as riskless as possible (Tr. 1915-1916).

The jury's finding that the Suncoast-New York Life trades included excessive markups was also supported by Shen's testimony that the trades were "off market," which he defined as any price over 1 or 2 ticks above the purchase price (Tr. 146-47) and Breckenridge's testimony that the spread on smaller transactions was no more than 2 to 2 1/2 ticks, and no more than 1 tick on larger transactions (Tr. 695).

The history of New York Life's trades with Suncoast, prior to the bribery scheme, also supported Arturi's testimony as to the industry standard for the markups.  The blotters Arturi reviewed revealed that none of the New York Life trades prior to January 28, 1998 had a markup of more than 1.75 ticks and that Suncoast had earned gross commissions of approximately $26,000 on all of Breckenridge's ten New York Life trades reflected on the blotters for 1997.  (Pl.'s Ex. 152, 154-B.)  After the bribery scheme began, the pattern of trades shifted

dramatically, and the evidence revealed a striking contrast in the size of the markups that Suncoast charged New York Life on its trades.  In the first trade after the date on which the jury could have reasonably concluded that the scheme began, following Breckenridge's dinner with Shen, Suncoast earned a gross commission of $25,390.63 based on a markup of 3.25 ticks, its commission on that single trade of a TBA security being roughly equal to its gross commissions on all of its prior trades with New York Life.  The following day, as Zwick was working on obtaining the All-Star tickets for Shen, Suncoast received more than double that amount on a single trade of the same type of TBA security with New York Life, earning $54,687.50 in gross commission on a markup of 7 ticks.  On March 30, 1999, Suncoast received $40,571.53 in gross commission on the trade of a TBA security, with a markup of 24 ticks.  In several trades involving specified pools, Suncoast earned over $100,000 in gross commissions, receiving a gross commission of $125,590.11 on a markup of 42.5 ticks on January 13, 1999 and a gross commission of $148,157.56 on a markup of 43 ticks about two weeks later, on January 25.  (See Pl.'s Ex. 154-B.)  Thus, the evidence of the pattern of trades that occurred between Suncoast and New York Life both before and after the bribery scheme began also supports the jury's verdict on the excessive-markup scheme.

Moreover, based on Shen's testimony the jury could

reasonably have concluded that the services provided by Suncoast did not justify its charging New York Life markups that exceeded the industry standard.  Quite the contrary, Shen explained that, as a "regional broker," Suncoast tended to execute trades more slowly than other broker-dealers with which New York Life dealt. He testified that he could have performed the same services himself that Suncoast provided to New York Life and that there was no cost advantage to having Suncoast perform the services on New York Life's behalf.  Also, he described Breckenridge, the sales representative at Suncoast with whom he dealt, as not particularly knowledgeable about the securities industry, and explained that Suncoast's prices were not favorable from New York Life's standpoint.  (Tr. 165-66.)

In essence, Suncoast provided a service of matching buyers with sellers for these securities and then exacting a transaction fee for the service.  That service, according to Shen, the trader at New York Life who actually used it, was neither exceptional nor even particularly useful in light of the other resources at New York Life's disposal.  In addition, according to substantial evidence in the record, these transactions—whether framed as agency transactions or riskless principal transactions—posed no risk to Suncoast.  Despite all this, the markups on many of these transactions vastly exceeded what the SEC's expert identified as the standard for the

industry.  Therefore, the jury could reasonably have concluded that, based on the particular facts and circumstances of this case, Suncoast's trades with New York Life involved excessive markups.

The defendants' evidence and authorities are insufficient to show that the markups in this case were not excessive as a matter of law.  Defendant Zwick points to the district court's decision in Press, which found that a markup of $158.86, or roughly 1/6 of one percent, on a trade involving a $100,000 United States Treasury bill was not excessive.  Press v. Chem. Inv. Servs. Corp., 988 F. Supp. 375, 385 (S.D.N.Y. 1997), aff'd, 166 F.3d 529, 536 (2d Cir. 1999).  However, on appeal, the Court of Appeals made it clear that the court disapproved of any bright-line rule as to an excessive markup and determined that an excessive markup must be determined based on an extensive analysis of all the relevant factors, as the jury was instructed to do in this case.  The Court of Appeals affirmed the finding that the markup in that case was not excessive only after considering all of the relevant factors.  Indeed, the Court of Appeals stated that "there may be cases where a $158 markup would be excessive," thus rejecting any bright-line formulation even for that minimal amount.  Press, 166 F.3d at 535–36.  As the Court of Appeals explained:  "To say that a specific range of mark-ups is acceptable for a given line of financial product

is to paint with a dangerously broad brush." Id. at 535.

The differences between the facts of this case and the facts in Press illustrate the danger of the bright-line rule rejected by the Court of Appeals. This case bears no reasonable relationship to Press where the plaintiff purchased a Treasury bill from an institutional broker dealer and paid $158.86. The purchases and sales by New York Life with excessive markups in this case involved far more substantial sales, with markups ranging from roughly $4,000 to almost $150,000 for total markups on such trades of $1.3 million, and the evidence showed that the industry practice was a markup of substantially less than that charged to New York Life.

The defendants also point to the opinion of the Court of Appeals for the Fourth Circuit in Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017 (4th Cir. 1997). It is true that in that case, in which the SEC appeared as an amicus, the Court of Appeals expressed discomfort with the possibility that there could be a requirement to disclose allegedly excessive markups of from 1.78 percent to 5.25 percent on Collateralized Mortgage Obligations ("CMOs") in the absence of an SEC rule that set out the standard for such markups. However, ultimately the Court of Appeals rested its decision on a finding that the bank plaintiff in that case did not rely on any presumption that the defendants were charging a fair markup. In this case, the SEC

is not required to establish reliance.  See, e.g., SEC v. Todt,
No. 98 Civ. 3980 (JGK), 2000 WL 223836, at *10 (S.D.N.Y. Feb.
25, 2000); SEC v. Norton, No. 95 Civ. 4451 (SHS), 1997 WL
611556, at *3 n.2 (S.D.N.Y. Oct. 3, 1997).  To the extent that
Banca Cremi expressed discomfort with the absence of a bright-
line rule establishing a safe harbor for markups, it is
inconsistent with the controlling decision of the Court of
Appeals in Press.

     The defendants also argue that the markups identified as
excessive by Arturi could not have been excessive in this case
because two separate audits by the NASD, completed January 1999
and January 2000, failed to reveal problems with Suncoast's
government securities business (Defs.' Ex. 9, 12), and the
report in January 2000 specifically noted that the staff had
reviewed "the member's government securities business including
markups/markdowns....  The staff found no problems with the
member's government securities business." (Defs.' Ex. 9 at
D0450.)  Although these reports provide some support for the
defendants' position that the markups were not excessive, they
do not establish that the markups were not excessive as a matter
of law or that the jury's verdict was seriously erroneous.  The
reports were properly presented to the jury for its
consideration of whether the markups were excessive.  On the
other hand, no examiner from the NASD testified, and there is no

way of determining what factors the NASD took into account in reaching its conclusions and whether the examiners focused on the specific New York Life trades, even though they had access to that information.  Moreover, there is no evidence that the examiners focused on all of the factors that the Court of Appeals has indicated should be considered in determining whether markups are excessive.  The reports did not require that the jury reject the other evidence in the case including, among other things, Arturi's expert opinion regarding the reasonableness of the markups.

Defendant O'Donnell points to other materials that he claims establishes that there is an industry standard that is in excess of the markups charged in this case.  He claims that the prevailing guideposts for the industry in 1998 and 1999 were an NASD statement that markups in excess of 5 percent above the prevailing market price for a security would be considered unreasonable, see Letter from NASD Board of Governors, dated Oct. 25, 1943, attached as App. A to S.E.C. Exchange Act Release 34-3623, 1943 WL 32866 ("NASD 5% Policy"), and the SEC's suggestion that "common industry practice... is to charge a mark-up over the prevailing inter-dealer market price of between 1/32 % and 3 1/2 % (including minimum charges) for principal sales to customers of conventional or 'straight' Treasuries, depending on maturity, order size and availability," Zero-Coupon

Securities, S.E.C. Exchange Act Release 34-24368, 1987 WL

756237, at *3 (April 21, 1987) ("Zero-Coupon Release").

However, the NASD 5% Policy did not apply to securities

issued by Government agencies, and, in any event, it was a guide

and not a rule.  It pointed out that most securities

transactions contained markups of not over 5 percent.  However,

the letter announcing the policy stated that

> it would be impracticable and unwise, if not
> impossible, to write a rule which would attempt to
> define specifically what constitutes a fair spread or
> fair profit, or to say, in exact percentage or
> dollars, what would result, in each and every
> transaction, in a price to the customer which bears a
> reasonable relationship to the current market.

NASD Rule 2440 requires that members charge fair prices,

"taking into consideration all relevant circumstances," when

buying or selling for their own account, and "fair commission[s]

or service charge[s], taking into consideration all relevant

circumstances," when acting as an agent for the customer.  NASD

Manual, Conduct Rules, Rule 2440.  The NASD has adopted an

official interpretation of Rule 2440 in which it makes clear

that the "5% Policy" is a guide, not a rule, and that "[a] mark-

up pattern of 5% or even less may be considered unfair or

unreasonable under the '5% Policy.'"  NASD Manual, Conduct

Rules, IM-2440; see SEC v. Rauscher Pierce Refsnes, Inc., 17 F.

Supp. 2d 985, 998 (D. Ariz. 1998) ("The NASD has consistently

stated, and courts have consistently held, that the five percent

policy is not a rule, but merely a guideline."). The NASD interpretation of Rule 2440 also provides that, in the absence of evidence of the prevailing market price, "a member's own contemporaneous cost is the best indication of the prevailing market price of a security." IM-2440. Consistent with the framework for analyzing the reasonableness of markups outlined by the Court of Appeals in <u>Press</u>, the NASD interpretation of Rule 2440 details several relevant factors that must be considered in determining the fairness of a mark-up, "of which the percentage of mark-up is only one."[10]

Similarly, while the SEC's 1987 Zero-Coupon Release indicated an industry standard markup range from 1 tick to 3 1/2 percent for principal sales of Treasury securities and municipal securities, the release did not establish a bright-line rule. The release made clear that a markup within that identified range could be excessive depending on the facts and circumstances of the transaction. The SEC noted that a markup "as low as 1% of the face amount [of a zero-coupon security]... can result in a mark-up that is excessive relative to the prevailing market price because zero-coupon bonds trade at a

---

[10] The specific factors listed in IM-2440 are: (1) the type of security involved; (2) the availability of the security in the market; (3) the price of the security; (4) the amount of money involved in a transaction; (5) disclosure; (6) the pattern of markups; and (7) the nature of the member's business.

deep discount." Zero-Coupon Securities, 1987 WL 756237, at *5.[11]

Analyzing the language of the Zero-Coupon Release, the district court in Rauscher correctly found that "under some circumstances, markups as high as 3 1/2% may not be excessive, but under other circumstances markups above 1/32 of one percent may be excessive." 17 F. Supp. 2d at 999. The court also rejected the argument that the one percent figure mentioned in the Zero-Coupon Release created any sort of safe harbor. "There is simply no indication in the Release that the SEC was definitively stating that a markup below one percent could not also be excessive." Id.

"While the SEC and NASD have been willing to set a ceiling for markups, they have refused to set a floor, below which a markup can never be found excessive." Rauscher, 17 F. Supp. 2d at 998. In Rauscher, the court—after analyzing, among other things, the NASD 5% Policy and the Zero-Coupon Release—rejected the defendants' argument that markups on municipal securities ranging from .0236 percent to .7333 percent were not excessive as a matter of law, and the court emphasized the need to analyze the specific facts and circumstances of the transaction. See 17 F. Supp. 2d at 995–1000. Thus, neither the NASD 5% Policy nor

---

[11] "Zero-coupon securities are debt securities that do not pay interest to the holder periodically prior to maturity, and are sold, therefore, at a substantial discount from the face amount." Zero-Coupon Securities, 1987 WL 756237, at *1.

the SEC's Zero-Coupon Release could have provided O'Donnell with a bright-line rule or a safe harbor on which he could rely for the New York Life transactions in this case.

O'Donnell has also pointed to a Compliance Manual by Nomura Securities (Defs.' Ex. 22) as support for the position that the markups in this case were reasonable.  That manual, however, provides no such support.  In the section of the manual referred to, Nomura Securities indicates to its employees that the maximum permissible markups or markdowns on agency pass-through securities when the size of the trade is over $5 million is 1/2 of 1%.  (Id. at 49.)  The manual goes on to warn:

> The maximum mark-up/mark-down actually charged in any given transaction with a customer should depend on the nature of the transaction.  It may and often should be lower than the maximum permissible mark-ups/mark-downs set forth in this memo.  Traders should carefully weigh the facts and circumstances of each trade to determine the fairness and reasonableness of the mark-up or mark-down charged in a particular trade.

(Id.)  Consistent with Press, the manual goes on to note various factors to be taken into account including industry practice, availability of the security in the market, type of security, price/yield and time to maturity, size of the trade, prevailing market conditions, markup pattern, services provided to the customer, and disclosure.  (Id. at 49-51.)

In sum, considering all the evidence presented at trial and the particular facts and circumstances of this case, the jury could reasonably have concluded that the Suncoast-New York Life

trades included excessive markups.  There is no basis for upsetting the jury's finding on this point.

The defendants also argue that, even assuming the trades contained excessive markups, the defendants could not have known and were not reckless in not knowing at the time of the trades that the markups involved in this case would be considered excessive.  However, there was sufficient evidence presented at trial from which a jury could reasonably have concluded that the defendants knew that there were excessive markups in this case or that the defendants were reckless in not knowing that there were excessive markups.

Zwick, Breckenridge's supervisor and Suncoast's Chief Compliance Officer, testified that he reviewed the blotters that showed the markups on the New York Life trades.  (Tr. 1590-92.) The jury could reasonably conclude that Zwick knew that the markups being charged to New York Life were excessive, particularly given the size and pattern of the markups, the lack of services being provided by Suncoast, and the striking contrast between the pre- and post-bribery trades, which were reflected on the trade blotters that Zwick reviewed.  Moreover, his awareness of the excessiveness was underscored by his advice to Breckenridge to keep the trades quiet.

The evidence summarized above also shows that O'Donnell was aware that excessive markups were being charged to New York

Life.  He researched the market and knew what the market prices were and then executed trades that included excessive markups and attempted to disguise the existence of the markup scheme.

Like the defendants in Rauscher, the defendants here argue that because of guideposts such as the NASD 5% Policy, the SEC's Zero-Coupon Release, the NASD reports on Suncoast's trades, and the other evidence adduced at trial, the defendants lacked fair notice that the markups in this case would be considered excessive.  However, the issue of the defendants' state of mind presented a question of fact that was properly presented to the jury.  See Rauscher, 17 F. Supp. 2d at 1001.  The defendants had every opportunity to argue to the jury that the evidence in the case demonstrated that they lacked notice that the markups could be considered excessive.  However, there was sufficient evidence to establish that this case involved markups that were actually excessive, including evidence of the industry standard established by both lay and expert testimony in the case, together with all of the particulars of the trades and the defendants' efforts to disguise the trades or keep them quiet.  As a result, a reasonable jury could conclude that the defendants knew or were reckless in not knowing that the markups involved in this case were excessive.

The defendants also argue that finding the markups identified in this case to be excessive would be a violation of

their right to due process because this would be a substantive
change in SEC enforcement policy that has never been announced.
The defendants rely on Upton v. SEC, where the Court of Appeals
for the Second Circuit found that, to satisfy the requirements
of due process, the SEC could not sanction the petitioner in
that case "pursuant to a substantial change in its enforcement
policy that was not reasonably communicated to the public."  75
F.3d 92, 98 (2d Cir. 1996) (finding that the SEC could not
sanction a person for evading the reserve requirements of Rule
15c3-3(e) because the SEC had not previously indicated that it
would not interpret the Rule literally).

     In this case, however, it has been the SEC's position that
there is no bright-line floor beneath which any markup is
reasonable.  Indeed, in Press, issued long before the trades in
this case, the Court of Appeals accepted the SEC's position that
the creation of a bright-line floor would be dangerous.  While
the defendants assert that the SEC had never brought an
enforcement action with markups of less than one percent, and
none as low as the markups found to be excessive in this case,
that is not in fact true.  In Rauscher, the SEC charged that
markups of from .02 of one percent (less than one tick) to .77
of one percent on the securities in that case were excessive.
Rauscher, 17 F. Supp. 2d at 1001.  The court found that the
claim could not be dismissed as a matter of law because

excessiveness was a matter of fact to be determined based on all of the facts, and the court specifically rejected the arguments that the defendants did not have fair notice of the SEC's policy and that the SEC was attempting to impose a new policy retroactively.  See also In re BT Alex. Brown Inc., S.E.C. Exchange Act Release 34-42145, Securities Act Release 33-7772, 1999 WL 1038063 (Nov. 17, 1999) (cease and desist order entered on consent where the SEC alleged that markups of .449 percent on Treasury securities were excessive).  So too in this case.  The defendants were on notice that there was no safe harbor that prevented a finding of excessive markups when, under all of the facts and circumstances of the trade, the markup was excessive. Moreover, the jury could reasonably have found that the defendants in this case were aware that the markups charged in this case were excessive and thus could not claim that they did not know that they were charging excessive markups.  Just as in Rauscher, the SEC is not attempting to apply a new standard retroactively.  Rather, the SEC asserted, and the jury accepted, that based on the industry standard at the time the trades in this case occurred, along with the other relevant facts and circumstances of this case, markups on the Suncoast-New York Life trades were excessive.

Finally, O'Donnell argues that the jury's failure to find that he committed fraud directly is inconsistent with its

determination that he had the mental state to aid and abet Breckenridge's and Shen's fraud.  There is, however, no inconsistency between those findings.  Section 10(b) and Rule 10b-5 and Section 17(a) proscribe failures to disclose material information under certain circumstances.  Section 20(e) proscribes providing substantial assistance to others in their commission of Section 10(b) and Rule 10b-5 violations.  A defendant substantially assists a primary violation of Rule 10b-5 if the defendant's conduct is a substantial causal factor in the perpetration of the underlying fraud.  See Rolf v. Blyth, Eastman, Dillon & Co., Inc., 570 F.2d 38, 48 (2d Cir. 1978). Given the respective roles of the participants in this scheme, the jury could reasonably have concluded that the duty to disclose the excessive markups resided in the first instance with Breckenridge, the Suncoast sales representative who maintained the client contact with New York Life and arranged the trades and set the prices, and Zwick, her supervisor, not with O'Donnell, who did not communicate with the customer directly.  However, O'Donnell's execution of the excessively marked up trades was undoubtedly a substantial causal factor in the perpetration of the excessive-markup scheme.  The jury's verdict is not inconsistent.

Based on all the evidence in this case, a reasonable jury could have concluded that the Suncoast-New York Life trades

included excessive markups.  There is no basis for upsetting the jury's verdict.

### B.

Only Zwick was found liable for the bribery scheme.  The jury found that he was liable for violating Section 17(a) and Section 10(b) and Rule 10b-5 by participating in a scheme to provide bribes, kickbacks, and items of value to Shen in exchange for Shen's directing trades from New York Life to Suncoast.  The jury also found that Zwick, but not O'Donnell, aided and abetted Breckenridge and Shen in a scheme to provide bribes, kickbacks and items of value to Shen in exchange for Shen's directing trades from New York Life.

Zwick argues that these findings should be set aside and Zwick should be found not liable on these claims because he alleges that the testimony by Breckenridge about his participation in the scheme was not credible and should have been disregarded by the jury.  Credibility determinations, however, were for the jury and there is no basis to overturn those determinations.  See Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000) (stating that in considering a Rule 50 motion, a court is not permitted to "assess the weight of conflicting evidence, pass on the credibility of witnesses, or substitute its judgment for that of the jury"); DLC Management

Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998)
(explaining that, on a Rule 59 motion, "a court should rarely
disturb a jury's evaluation of a witness's credibility").
Moreover, there was ample evidence for the jury to credit
Breckenridge's testimony.  It was undisputed that Zwick
purchased the tickets to the NBA All-Star game for $6,400 for
Shen and that Suncoast promptly received trades and substantial
commissions from New York Life.  Zwick also subsequently
discussed the tickets to the Knicks game with Breckenridge and
gave her the number for the ticket broker.  Breckenridge
testified credibly that Zwick was aware of the one-way betting
scheme to provide payments to Shen and discussed with
Breckenridge that she had paid off her bets.  As Breckenridge's
supervisor, Zwick was also aware of the very substantial trades
with New York Life, and the excessive markups on those trades.

     Zwick argues that the jury must have disbelieved
Breckenridge's testimony because it did not find O'Donnell
liable in connection with the bribery scheme even though
Breckenridge testified that O'Donnell was aware of the betting
scheme.  Even if this were correct, it would provide no help to
Zwick because the jury is entitled to find that parts of a
witness's testimony are accurate and parts are not.  See, e.g.,
United States v. Ortiz, 367 F. Supp. 2d 536, 543 n.1 (S.D.N.Y.
2005) ("A jury may believe some parts of a witness' testimony

while disbelieving others."). However, there is no reason to believe that the jury found any of Breckenridge's testimony not to be credible. The jury could have concluded that Zwick's participation in the bribery scheme was far more substantial than O'Donnell's mere knowledge of the scheme, and that Zwick's actions rose to the level necessary for participation in and aiding and abetting that scheme while O'Donnell's actions did not.

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, they are either irrelevant, without merit, or moot.


### IV.

The SEC seeks permanent injunctive relief, disgorgement, and civil penalties against each of the defendants for their violation of the securities laws.


### A.

The SEC seeks a permanent injunction against each defendant prohibiting the defendant from violating Section 17(a), Section 10(b) and Rule 10b-5. Permanent injunctive relief is authorized under Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), both of which provide that "upon a proper showing a permanent or

temporary injunction or restraining order shall be granted...."

A district court has broad discretion to enjoin possible future violations of the federal securities laws in view of a showing of past violations, when there is a reasonable likelihood that, unless enjoined, the violations will continue. First Jersey Sec., 101 F.3d at 1477; SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1048 (2d Cir. 1976); SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972).  In determining whether a proper showing has been made, the Court must find a reasonable likelihood that past wrongdoing will recur.  See SEC v. Bausch & Lomb Inc., 565 F.2d 8, 18 (2d Cir. 1977); SEC v. Johnson, No. 03 Civ. 177 (JFK), 2006 WL 2053379, at *4 (S.D.N.Y. July 24, 2006).  To make this showing the SEC is required to go beyond the mere facts of past violations.  See SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 100 (2d Cir. 1978).  However, "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations." Manor Nursing Ctrs., 458 F.2d at 1100; SEC v. Savino, No. 01 Civ. 2438 (GBD), 2006 WL 375074, at *16 (S.D.N.Y. Feb. 16, 2006), aff'd in part and remanded in part, No. 06-1398-cv, 2006 WL 3523784 (2d Cir. Dec. 6, 2006).

The Court will also consider the degree of the scienter involved; the sincerity of the defendant's assurances against future violations; the isolated or recurrent nature of the

infraction; the defendant's recognition of the wrongful nature
of his conduct; and the likelihood, because of the defendant's
occupation, that future violations might occur.  See Universal
Major Indus., 546 F.2d at 1048.  There is no requirement that
the SEC demonstrate irreparable injury or lack of any adequate
remedy at law.  See SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801,
808 (2d Cir. 1975).  The Court, however, will engage in the
traditional balancing of the equities before issuing an
injunction.  See SEC v. Geon Indus., Inc., 531 F.2d 39, 54-55
(2d Cir. 1976); Savino, 2006 WL 375074, at *16.  "[A] district
court is called upon to assess all those considerations of
fairness that have been the traditional concerns of equity
courts."  Manor Nursing Ctrs., 458 F.2d at 1102; Johnson, 2006
WL 2053379, at *4.


### 1.

     Zwick acted with a high level of scienter.  With respect to
the bribery scheme, it is undisputed that he authorized and
indeed procured the NBA All-Star tickets for Shen that began
Suncoast's participation in the scheme.  While Zwick argues that
it was Shen who initiated the scheme, Breckenridge came to Zwick
with the request and it was Zwick, as a senior official at the
firm and Chief Compliance Officer, who authorized Suncoast's
participation.  Zwick could not have failed to see the

substantial fees that accrued to Suncoast as a result of that bribe.  Moreover, the evidence also supports the conclusion that Zwick was aware of the progress of the scheme, including the subsequent betting scheme, although it is undisputed that Breckenridge did not inform Zwick when she substituted a commission-sharing scheme for the betting scheme.  Nevertheless, the evidence establishes that Zwick acted with a high degree of scienter in the bribery scheme.

Zwick's level of scienter with respect to the excessive-markup scheme is a closer question given the range of markups in this case, including markups that are at the low end of markups as to which the SEC has brought enforcement actions.  Moreover, the failure of the NASD examiners to find any problems with the government securities business of Suncoast provides some support for Zwick's position that he lacked a high level of scienter with respect to that scheme.  Nevertheless, the jury's verdict that Zwick acted with scienter with respect to that scheme is amply supported by the evidence, particularly considering the nature of the transactions, the size of the fees charged by Suncoast, the absence of risk involved, and the quid pro quo nature of the business obtained by Suncoast from New York Life.

Zwick argues that an injunction is not warranted because his only violation was the procurement of the NBA All-Star tickets, and his obtaining the tickets was an isolated event.

This ignores the evidence of Zwick's continuing participation in the bribery scheme and his continuing participation in the excessive-markup scheme.  The bribes continued from January 1998 into 1999.  With respect to the excessive markups, there were twenty-seven trades with New York Life that included gross commissions of almost $1.3 million on trades that occurred from January 1998 to April 1999.  The number and repetitive nature of the violations justifies injunctive relief.  See Savino, 2006 WL 375074, at *17; SEC v. Freeman, 290 F. Supp. 2d 401, 405 (S.D.N.Y. 2003); SEC v. McCaskey, No. 98 Civ. 6153 (SWK), 2001 WL 1029053, at *5 (S.D.N.Y. Sept. 6, 2001); SEC v. Milan Capital Group, Inc., No. 00 Civ. 108 (DLC), 2000 WL 1682761, at *9 (S.D.N.Y. Nov. 9, 2000).

Zwick does not specifically address the other factors relevant to an injunction, but those factors also support a finding that an injunction is an appropriate remedy in this case.  While Zwick has conceded that he made a mistake with respect to the NBA All-Star tickets, he has not acknowledged his participation in any other aspects of either the bribery scheme or the excessive-markup scheme.  Moreover, he has made no representation regarding future violations of the securities laws.  However, as Judge Keenan recently explained, relying on an opinion by the Court of Appeals for the District of Columbia Circuit:

> We think 'lack of remorse' is relevant only where
> defendants have previously violated court orders, or
> otherwise indicate that they did not feel bound by the
> law.  As such, it is really only another indication as
> to whether it is 'reasonably likely' that future
> violations will occur in the absence of an injunction.

Johnson, 2006 WL 2053379, at *6 (quoting SEC v. First City Fin.

Corp., Ltd., 890 F.2d 1215, 1229 (D.C. Cir. 1989)).  These

factors do not control whether an injunction should be issued in

this case.

        While Zwick is not currently employed in the securities

industry, and while he asserts that the jury finding of his

participation in a fraud will preclude his future employment in

the industry, there is no bar to his employment in some capacity

in the industry, and, as the SEC points out, the are areas of

the securities industry, such as hedge funds, which are possible

employers.

        On balance, the relevant factors favor issuance of a

permanent injunction against future violations of the securities

laws that the jury found that Zwick violated.

        Zwick argues that the injunction proposed by the SEC is too

broad.  Specifically, relying on the opinion in SEC v. Smyth,

420 F.3d 1225, 1233 n.14 (11th Cir. 2005), he argues that the

injunction merely instructs Zwick to obey the federal securities

laws by citing the statutory text of the relevant provisions,

without specifying the conduct Zwick is enjoined from doing.  As

Zwick candidly acknowledges, however, the Court of Appeals for

the Second Circuit has found that such an injunction is in fact
proper.  See Manor Nursing Ctrs., 458 F.2d at 1103.  Therefore,
the proposed injunction is not overly broad simply because it is
worded in terms of the specific statutory provisions that Zwick
was found to have violated.  See id.

However, the Court will limit the injunction to Zwick.
While the SEC sought an injunction not only against Zwick but
also against his "agents, servants, employees, attorneys, and
all persons in active concert or participation with them who
receive actual notice," the complaint only sought an injunction
against Zwick and there is no basis for a broader injunction.
See Johnson, 2006 WL 2053379, at *7 n.4.

### 2.

The SEC similarly seeks a permanent injunction against
O'Donnell, prohibiting him from violating Section 10(b) and Rule
10b-5 based on the jury's finding that O'Donnell aided and
abetted Breckenridge and Shen in a scheme to fail to disclose to
New York Life excessive markups charged by Suncoast in violation
of Section 10(b) and Rule 10b-5.  O'Donnell argues that an
injunction should not be entered against him.  However, the
balance of the relevant factors indicates that an injunction
should also be entered against O'Donnell.

O'Donnell asserts that the SEC failed to show that he acted

with scienter, and he contends that he thought that the markups charged to New York Life were consistent with industry standards and with the rules and regulations of the SEC and the NASD.  The jury was properly instructed that, to be found liable for aiding and abetting, the SEC was required to prove by a preponderance of the evidence that the defendant acted knowingly or recklessly, hence with scienter.  (See Tr. 2147.)  The jury's finding of liability supports a finding that O'Donnell acted with scienter.  See Johnson, 2006 WL 2053379, at *5-6; see also SEC v. Ginsburg, 362 F.3d 1292, 1305 (11th Cir. 2004). Moreover, the summary of the evidence discussed above supports the conclusion that O'Donnell knowingly aided and abetted a scheme to charge markups that he knew were excessive and attempted to disguise the existence of the scheme.  While O'Donnell claims that there were no industry standards that established that the markups in this case were excessive, Arturi credibly testified that the markups did in fact exceed industry standards for such markups, and there was no contrary expert evidence.  That testimony was also consistent with the testimony of Breckenridge and Shen.  While O'Donnell contends that the rules and regulations in the industry established various benchmarks such as 5 percent or 1 percent as industry standards, that is not in fact true, for the reasons explained above. Indeed, both the SEC and the NASD had declined to establish a

safe-harbor for markups.   Rather, the NASD interpretation of
Rule 2440, discussed above, instructs members to charge
"reasonable" commissions and explains that the reasonableness of
a transaction must be assessed based on a consideration of all
of the relevant factors, "of which the percentage of mark-ups is
only one."   The jury was instructed about the existence of the
standards set by the NASD and the SEC and was instructed that
these standards could be considered in determining whether the
defendants acted with the requisite state of mind.   (Tr. 2148–
53.)   Having been instructed on these regulations, the jury
reasonably determined that O'Donnell had the requisite state of
mind.

However, in determining the fairness of issuing an
injunction in this case, it is significant that the jury
concluded that O'Donnell was not liable for direct participation
in the bribery scheme or for aiding and abetting the bribery
scheme.   Furthermore, while there was sufficient evidence to
support the jury's conclusion that O'Donnell acted with the
requisite scienter with respect to aiding and abetting the
excessive-markup scheme, the size of the markups that were at
issue in this case fall at the extreme low end of the markups
that have been held to be sufficient to state a claim for an
excessive markup.[12]   Thus, while the element of scienter favors

---

[12] See, e.g., In re First Honolulu Sec., Inc., S.E.C. Exchange Act

the entry of an injunction against O'Donnell, the Court will take these additional factors into account in fashioning an injunction.

O'Donnell argues that he should not be penalized for contesting the SEC's charges against him.  He argues that he should not be penalized for not acknowledging wrongdoing and that he should not be penalized for not providing sincere assurances that he will not violate the law again when he contends that he has not violated the law.  It is true that O'Donnell had the right to contest the charges against him.  However, there is some evidence that O'Donnell attempted to disguise the existence of the markup scheme.  In any event, for the reasons expressed with respect to Zwick, the Court gives little weight to these factors in this case.

O'Donnell argues that this was an "isolated occurrence," and he points to the fact that he was only involved in at most twenty trades on which the SEC contends that there was an excessive markup.  However, these trades spanned the period from January 1998 to April 1999, and included the most substantial trades on which excessive markups were charged to New York Life, including the three trades in late January and early February

---

Release No. 34-32933, 1993 WL 380039, at *4 (Sept. 21, 1993) (setting aside NASD findings of violations for markups between 4 percent and 5 percent); MMAR Group, Inc., 1996 WL 1114532, at *9-11 (NASD, NBCC Oct. 22, 1996) (reversing findings of fraud by dealer charging markups from 1.54 percent to 4.56 percent on CMO derivatives).

1998 where the total markups exceeded $100,000, and the two
trades in January 1999 where the total markups exceeded
$270,000.  This pattern of aiding and abetting the excessive-
markup scheme cannot be considered an isolated occurrence.  See,
e.g., SEC v. Svoboda, 409 F. Supp. 2d 331, 343 (S.D.N.Y. 2006)
(issuing permanent injunctions and finding that an insider
trading scheme that lasted four years, involved twenty issuers,
and "employed numerous measures to evade detection" constituted
"systematic wrongdoing"); Freeman, 290 F. Supp. 2d at 405-07
(granting permanent injunction where defendant used inside
information to trade securities on eight occasions over the
course of two years); SEC v. Sekhri, No. 98 Civ. 2320 (RPP),
2002 WL 31100823, at *15 (S.D.N.Y. July 22, 2002) (granting
permanent injunction where defendant's misappropriation scheme
lasted more than one year and utilized confidential information
on five corporate transactions); McCaskey, 2001 WL 1029053, at
*5 (granting permanent injunction where defendant's stock
manipulation scheme lasted seven months and utilized multiple
accounts); Milan Capital Group, 2000 WL 1682761, at *9 (granting
permanent injunction where defendants' IPO scheme lasted
"several months" and involved hundreds of investors).  This
factor therefore weighs in favor of imposing an injunction.

     O'Donnell argues that there is no likelihood of a future
violation because O'Donnell has lost his job and is currently

involved in the mortgage business.  However, as the SEC argues, there is a reasonable likelihood that he could obtain a position in the securities industry, including for example with a hedge fund.  See Johnson, 2006 WL 2053379, at *7.  Thus, this factor weighs in favor of an injunction.

On balance, the SEC has shown that there is a reasonable likelihood that, unless enjoined, the violations will continue, and thus that an injunction should be issued.  However, as in Johnson, a permanent injunction should not be imposed. O'Donnell was not found liable for either participating in or aiding and abetting the bribery scheme, and he was found not to have participated directly in the excessive-markup scheme but only to have aided and abetted Breckenridge and Shen in their violation of Section 10(b) and Rule 10b-5 in connection with that scheme.  The excessive markups in this case were at the low end of the range for cases that have been brought involving excessive markups.  O'Donnell has already paid a heavy price for his participation in the scheme, which includes the loss of his employment.  An injunction which is less than permanent will assure that the violations do not recur.  An injunction that is less than permanent is also fair in light of all of the factors discussed above.  The Court will therefore impose a five year injunction prohibiting O'Donnell from violating Section 10(b) and Rule 10b-5.  See Johnson, 2006 WL 2053379, at *7.  As with

Zwick, the injunction will be limited to O'Donnell and not
include others as to whom the complaint sought no relief and as
to whom there is no evidence of the need for such an injunction.

### B.

The SEC also seeks disgorgement of the allegedly ill-gotten
gains from Zwick and O'Donnell.  From Zwick, the SEC seeks
$181,625.18.  That figure is based on the SEC's calculations of
Zwick's share of the gross commissions on all of the New York
Life trades that occurred after the bribery and excessive-markup
scheme began.  The SEC's calculations begin with the first trade
that included an excessive markup, which occurred on January 28,
1998, and include all of the trades with New York Life
thereafter, irrespective of whether the trade contained an
excessive markup.  The SEC seeks $53,567.44 in disgorgement from
O'Donnell.  That figure represents his commissions earned on the
twenty trades that the SEC contends he executed that contained
excessive markups.  The defendants raise various arguments with
respect to these calculations.

Disgorgement of the defendants' ill-gotten gains from the
fraud is an equitable remedy that is appropriate in actions such
as this one to enforce the federal securities laws.  See SEC v.
Fishbach Corp., 133 F.3d 170, 175 (2d Cir. 1997); First Jersey
Sec., 101 F.3d at 1474-75.  "The paramount purpose of...

ordering disgorgement is to make sure that wrongdoers will not profit from their wrongdoing." SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987).  The disgorgement amount need only be a "reasonable approximation of profits causally connected to the violation."  SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1995) (quoting First City Fin., 890 F.2d at 1231).  "[A]ny 'risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'"  Id. at 140 (quoting First City Fin., 890 F.2d at 1232). Disgorgement is "remedial and not punitive" and the "court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." SEC v. MacDonald, 699 F.2d 47, 54 (1st Cir. 1983).

### 1.

The SEC calculated the amount of disgorgement sought from Zwick, namely $181,625.18, by taking the total gross commissions earned by Suncoast on its trades with New York Life during the period from January 28, 1998 to May 13, 1999, subtracting out Breckenridge's commissions, and applying Zwick's proportional interest in the income of the firm.

(a) Zwick contends that the gross commissions should not include any commissions that Suncoast earned when one of the counter parties to the trade was a Suncoast client such as UBAN

Associates or Pacific Investment ("Pimco").  Zwick argues that
in such a case only the commission earned on the purchase or
sale with New York Life and not the corresponding sale or
purchase with Suncoast's other client should be included.  The
SEC correctly responds, however, that it was the entire trade
that was obtained as part of the bribery or excessive-markup
scheme and that consequently the profit from the entire trade
should be subject to disgorgement.

     (b) Zwick argues that the trades from which commissions are
calculated should be limited to the twenty trades on which
excessive markups were charged and should not include the
remaining trades with New York Life.  The SEC responds that all
profits that he received during the course of the bribery and
excessive-markup scheme should be subject to disgorgement.  See
SEC v. Bilzerian, 814 F. Supp. 116, 121 (D.D.C. 1993) ("[I]t is
proper to assume that all profits gained while defendants were
in violation of the law constituted ill-gotten gains."), aff'd
29 F.3d 689 (D.C. Cir. 1994).  However, the SEC must make at
least a prima facie showing that the gains are a reasonable
approximation of profits causally connected to the wrongdoing in
order to shift the burden of going forward to the defendants to
demonstrate that the SEC's calculation is not a reasonable
approximation.  See First City Fin., 890 F.2d at 1232;
Bilzerian, 814 F. Supp. at 121.  The SEC bears the ultimate

burden of persuasion on this point.  First City Fin., 890 F.2d at 1232.

Zwick argues that the SEC has failed to demonstrate a prima facie causal relationship between the trades with New York Life on which there were no excessive markups and either the excessive-markup scheme or the bribery scheme.  It is plain, of course, that there is no causal relationship between the excessive-markup scheme and the transactions on which there were no excessive markups.  But the SEC correctly argues that after the bribery scheme began with the provision of the NBA All-Star tickets, there was a flow of trades that was bought by the continuing bribery scheme.  The SEC has demonstrated that transactions were obtained as a result of the bribery scheme; it is not possible to separate out individual transactions and conclude that the transaction was not obtained by the bribery scheme simply because it did not contain an excessive markup. For example, Breckenridge testified that Suncoast obtained a May 8, 1998 TBA security from New York Life which it sold to Salomon Smith Barney for a gross commission of $15,625.00 with a 2 tick markup.  (Pl.'s Ex. 154-B; Tr. 765.)  This transaction was not included in the list of transactions with excessive commissions because the markup did not exceed 2 ticks.  However, Breckenridge testified that Suncoast obtained the transaction and the considerable commission because she bought and provided

Knicks tickets to Shen with Zwick's knowledge.  (Tr. 765.)
Given the flow of trades that were caused by the bribery scheme,
the gross commissions on all of the trades between Suncoast and
New York Life, including those without excessive commissions,
that occurred after the inception of the bribery scheme should
be included in the calculation of disgorgement.  See Patel, 61
F.3d at 140; Bilzerian, 814 F. Supp. at 121.[13]

(c) Zwick argues that several expenses should be deducted
from the gross commissions, in addition to Breckenridge's
commissions, before applying his percentage of the profits from
Suncoast to that amount.  In particular, he argues that the
amount paid to the clearing agent and the amount paid to the
trader should be deducted.

"Although some courts have recognized that brokerage
commissions and other related transaction costs may be deducted
from a defendant's disgorgement total, general business expenses
may not be deducted."  Svoboda, 409 F. Supp. 2d at 345 (citation

---

[13] Zwick also argues that the commissions on three trades should
not be included, those that occurred on January 13, 1999, January 25,
1999, and March 25, 1999.  He argues that there is particular reason
to question Arturi's inclusion of those trades in the list of trades
with excessive markups.  He argues that the first two trades required
particular efforts on the part of Suncoast, and the last trade was a
specified pool rather than a TBA.  None of these arguments are
persuasive.  The markups on these trades were 42.5 ticks, 43 ticks and
24 ticks respectively. (See Pl.'s Ex. 154-B.)  The markups on all of
these trades were excessive no matter how they are characterized, and
there is no basis to dispute Arturi's characterization of the markups
as excessive.  Consequently, all of the commissions on these trades
should be included in the total of gross commissions as to which
Zwick's share should be disgorged.

omitted).  The defendant bears the burden of demonstrating that he is entitled to any offsets, as the risk of uncertainty in calculating disgorgement falls on him.  Id.  Zwick has failed to offer sufficient evidence that the amount he claims was paid to the clearing agent was actually paid on these sales and that this was more than a general business expense.  With respect to the amount of commissions paid to the traders, Zwick claims that the trader on a given transaction generally obtained 7 percent of the cost of the trade.  However, Zwick's assertion is inconsistent with O'Donnell's testimony that his amount of commission on these transactions varied.  Zwick has produced insufficient evidence of the amount of the traders' commissions obtained on these trades.  Nonetheless, it would be inconsistent to provide for the disgorgement of O'Donnell's commissions on twenty of these trades and yet conclude that there is no evidence of the commissions on those trades.  Therefore, the amount of O'Donnell's commissions, in addition to Breckenridge's, should be deducted from the gross commissions as to which Zwick's percentage interest is then applied.  In addition, in calculating Zwick's interest in the commissions, the SEC conceded at the hearing on relief that the correct measure would reflect that Zwick held a one-third interest in the general partner that in turn held a 66.5 percent interest in Suncoast.

(d) Zwick argues that the amount of disgorgement should be reduced by the amount of taxes he has already paid on any wrongful profits he made from the New York Life trades.   Zwick is not entitled to such a deduction for two reasons.   First, Zwick has not provided sufficient evidence from which the Court can precisely determine "the amount of additional taxes paid due to the illegal trades or the potential effect of a disgorgement order on future tax liability."   Svoboda, 409 F. Supp. 2d at 345.   Specifically, Zwick has not provided the Court with any tax returns or other evidence to verify his conclusory assertions about the amount of taxes he paid on the income he earned from Suncoast in 1998 and 1999.   Second, the deduction from the disgorgement amount that Zwick seeks for general income taxes does not fall within the class of deductions occasionally allowed for transaction-specific costs.   See id.; SEC v. World Gambling Corp., 555 F. Supp. 930, 935 (S.D.N.Y. 1983) ("The 'profit obtained' cannot be said to be a punitive standard for disgorgement, even thought it may be slightly overstated by overhead and income taxes....").

Therefore, disgorgement should be ordered pursuant to the methodology advanced by the SEC, except that the amount of O'Donnell's commissions should be excluded from the amount as to which Zwick's percentage of profit from Suncoast, as explained above, is applied.

Zwick does not object to the application of pre-judgment interest to the amount of disgorgement.  Pre-judgment interest is added to disgorgement to ensure that a defendant does not profit from his unlawful securities transactions by retaining the time-value benefit of his ill-gotten gains from the time of the fraud to the date of the judgment in the SEC's actions. First Jersey Sec., 101 F.3d at 1476-77; SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).  The pre-judgment interest shall be the rate set by the Internal Revenue Service for money owed to the United States Treasury, which is "the rate that best approximates the use value of [the defendant's] ill-gotten gains."  Savino, 2006 WL 375074, at *18 (citing 26 U.S.C. § 6621(a)(2)); see also First Jersey Sec., 101 F.3d at 1476. Pre-judgment interest should be computed from the time Suncoast fraudulently obtained the commissions through the date of judgment.  The SEC should prepare a new calculation of disgorgement and submit it together with a new proposed judgment.

### 2.

The SEC seeks disgorgement from O'Donnell in the amount of $53,567.44, which the SEC calculates to be the amount of commissions on the twenty trades executed by O'Donnell involving New York Life that contained excessive markups.  O'Donnell

raises several objections to the calculation.

(a) O'Donnell argues that the SEC should only be entitled
to obtain disgorgement based on the specific trades listed in
the complaint.  The argument is baseless.  The SEC was not
required to list all of the trades in the complaint, and it was
clear from the report of the SEC's expert, produced in advance
of trial, what trades were being alleged to contain excessive
markups.

(b) O'Donnell contends that disgorgement cannot be
calculated on all of the twenty trades that he executed that
contained excessive markups because the jury did not identify
the trades that it found to have contained excessive markups.
This argument also is without merit.  O'Donnell never sought to
have the jury answer any special interrogatory identifying which
trades it found to have contained an excessive markup.  In any
event, disgorgement is an equitable remedy and the amount of
disgorgement is for the Court to determine.  See First Jersey
Sec., 101 F.3d at 1474 ("Once the district court [finds] federal
securities law violations, it has broad equitable power to
fashion appropriate remedies, including ordering that culpable
defendants disgorge their profits.").  There was ample evidence
at trial to conclude, as the Court does, that the twenty-seven
trades identified by Arturi as containing excessive markups did
in fact contain excessive markups.  Therefore, the commissions

earned by O'Donnell on the twenty of the twenty-seven trades identified as containing excessive markups are properly subject to disgorgement.

(c) O'Donnell argues that disgorgement should only be ordered on the commission that he earned on that portion of the markups that exceeded a reasonable markup.  This argument also has no merit.  The excessive-markup scheme was to obtain trades for Suncoast that included excessive markups.  Consequently, all of the gain on those trades should be included in the amount that is subject to disgorgement.  See Bilzerian, 814 F. Supp. at 121; see also SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1308 (2d Cir. 1971).

(d) O'Donnell raises several specific objections to the inclusion of commissions on seven trades.  He objects to the inclusion of the trade on January 28, 1998 because that trade allegedly began before the scheme began.  There is no substance to that allegation.  The trade was effected at an excessive markup and occurred after Breckenrige had dinner with Shen in New York and marked the beginning of the trades with excessive markups.

O'Donnell does, however, raise some specific objections with respect to several additional trades which may lend themselves to the submission of additional evidence.  He contends that he was out of the country when trades occurred on

February 6, 1998, November 2, 1998, and December 28, 1998.  The
SEC responds that these trades nevertheless appeared on Blotter
929, which was O'Donnell's blotter for which he received
commissions.  O'Donnell also asserts that the two trades that
occurred on September 24, 1998 were recorded on Blotter 922 and
that he did not receive commissions for trades recorded on that
blotter.  Finally, O'Donnell asserts that he received only a 2
percent commission on the trades that occurred on March 25, 1999
and April 14, 1999, while the SEC has calculated the commission
at a 4 percent rate based on O'Donnell's trial testimony.  The
SEC correctly points out that there is no evidence submitted to
substantiate the defendant's assertions with respect to these
trades, and any ambiguities should be resolved against a
wrongdoer in calculating disgorgement.  See Patel, 61 F.3d at
140.  Nevertheless, there may be additional evidence in the
voluminous exhibits introduced at trial that may resolve these
issues more definitively.  The parties should have the
opportunity to present that evidence, if it exists, before the
Court finally resolves the issue of disgorgement based on these
sales.  The parties should submit any additional evidence with
respect to these sales as they relate to disgorgement within ten
(10) business days of the date of this Opinion and Order.

(e) O'Donnell objects to the imposition of pre-judgment
interest on the amount of disgorgement on the grounds that the

SEC unnecessarily delayed the investigation and prosecution of this action and indeed obtained a tolling agreement.  The argument has no merit.  There is no basis on which the Court could conclude that the action was unnecessarily delayed, and indeed O'Donnell was under no obligation to sign a tolling agreement.  In any event the award of pre-judgment interest is proper for the entire period from the time that O'Donnell obtained the ill-gotten gain until the date of the judgment because he has had the benefit of the use of those funds throughout that period.  See SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998).

## C.

The SEC seeks civil penalties from Zwick in the amount of $330,000 and from O'Donnell in the amount of $110,000.  The defendants assert that much lower penalties should be assessed.

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act provide for three tiers of civil monetary penalties.  15 U.S.C. §§ 77t(d), 78u(d)(3).  Tier I penalties shall not exceed $5,000 per natural person.  Id.  Tier II penalties are available if the violation involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and shall not exceed $50,000 per natural person.  Id.  Tier III penalties are available if the violation

involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and the violation "resulted in substantial losses or created a significant risk of substantial losses to other persons." Tier III penalties shall not exceed $100,000 per natural person. Id. The $100,000 penalty has been adjusted for inflation to $110,000 for violations occurring during the relevant time period. See 17 C.F.R. § 201.1001.

In assessing the amount of the penalty, courts have considered the following factors: (1) the egregiousness of the defendant's violations; (2) the level of scienter involved; (3) the repeated nature of the violations; (4) the defendant's willingness to admit his wrongdoing; (5) the losses or risk of loss the defendant's misconduct caused to others; (6) the defendant's cooperation and honesty with the authorities, and (7) the defendant's current and future financial situation. SEC v. Lybrand, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003); see also Savino, 2006 WL 375074, at *18.

### 1.

Zwick is plainly subject to a Tier III penalty. His conduct involved fraud, deceit, manipulation, and deliberate disregard of regulatory requirements. In addition, it resulted in substantial losses to New York Life. The same considerations

that resulted in the issuance of an injunction support a
substantial civil penalty.  The conduct was egregious.  It was
deliberate and occurred repeatedly over the course of more than
a year.  The losses to New York Life were substantial.  On the
other hand, there were some mitigating aspects to the fraud in
this case.  The excessive markups, for example, were at the low
end of the range of markups that had previously been subject to
regulatory actions by the SEC.  In addition, Zwick has undergone
substantial losses as a result of his actions in this case and
is currently unemployed.  While he has had substantial income in
the past, there is no assurance that he will be able to obtain
future employment.  Under all of the circumstances, a total
civil penalty of $75,000 is a reasonable penalty as to Zwick.


## 2.

O'Donnell is also subject to a Tier III penalty.  His
conduct involved fraud, deceit, manipulation, and deliberate
disregard of regulatory requirements.  His conduct also resulted
in substantial losses to New York Life.  For the reasons
explained above, the same considerations that indicate that an
injunction is warranted, also support the imposition of a civil
penalty.  However, O'Donnell's violation is limited to aiding
and abetting the scheme of charging excessive markups, and that
scheme involved markups that are at the low end of the range of

markups subject to the SEC's prior enforcement actions.
Moreover, O'Donnell has lost his job as a result of his actions
and the verdict in this case.  His resources are limited and
there is no assurance of the amount that O'Donnell will be able
to earn in the future.  Given all of the circumstances, a civil
penalty of $25,000 is a reasonable penalty as to O'Donnell.

## CONCLUSION

For the reasons explained above, the defendants' motions for judgment as a matter of law pursuant to Rule 50(b) or for a new trial pursuant to Rule 59, are **denied**.

The SEC and O'Donnell should submit any further evidence with respect to the disputed trades within ten (10) days of the date of this Opinion and Order or advise the Court that they have reached some disposition of the disputed trades.

Within five (5) days after resolution of the outstanding matters with respect to O'Donnell, the SEC should submit a revised judgment in accordance with this Opinion and Order.   The defendants may submit a counter-judgment five (5) days thereafter. Each party may submit a memorandum explaining any calculations contained in the proposed judgment.

**SO ORDERED.**

**Dated:  New York, New York**
       **March /6 , 2007**

**John G. Koeltl**
**United States District Judge**

- 69 -